

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| 36 BUILDERS, INC., a Delaware corporation, doing business as INSIGHT HOMES, and INSIGHT LAND COMPANY, LLC, a Delaware limited liability company, ) ) ) ) | C.A. No. 2020-0861-MTZ |
| Plaintiffs, ) | SUMMONS |
| ) | Pursuant to 10 Del.C. Sec. 3104 |
| v. ) | |
| ) | |
| JACK HUTCHINS HAESE, ) | |
| ) | |
| Defendant. ) | |

**THE STATE OF DELAWARE**

**TO:    FAEGRE DRINKER BIDDLE & REATH LLP:**

**YOU ARE COMMANDED:**

    To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of service, defendants shall serve upon <u>Joseph C. Schoell</u>, Esquire, Plaintiff's counsel, whose address is <u>Faegre Drinker Biddle & Reath LLP, 222 Delaware Avenue, suite 1410, Wilmington, Delaware 19801,</u> an answer to the verified complaint.

To serve upon defendants a copy hereof and of the complaint.

**TO THE ABOVE NAMED DEFENDANTS:**

    In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney named above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated:        October 16, 2020

_Susan Judge_
_____
Register in Chancery

**C.A. # 2020-0861-MTZ**

36 BUILDERS, INC., a Delaware corporation, doing business as INSIGHT HOMES,
and INSIGHT LAND COMPANY, LLC, a Delaware
limited liability company,

Plaintiffs,

v.

JACK HUTCHINS HAESE,

Defendant.

**SUMMONS**

Please effectuate service upon:

1.    **Jack Hutchins Haese**
      929 Mallard Circle
      Arnold, MD 21012

Pursuant to 10 <u>Del.C.</u> Sec. 3104(d)(3)

SERVICE TO BE COMPLETED BY FAEGRE DRINKER BIDDLE & REATH LLP -
Via Certified Mail

<u>Joseph C. Schoell, Esquire</u>
Plaintiff's Counsel

EFiled:  Oct 08 2020 12:59PM EDT
Transaction ID 66002606
Case No. 2020-0861-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| 36 BUILDERS, INC., a Delaware corporation, doing business as INSIGHT HOMES, and INSIGHT LAND COMPANY, LLC, a Delaware limited liability company, | ) ) ) ) ) | |
| | ) | C.A. No. _____ |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| JACK HUTCHINS HAESE, | ) ) | |
| Defendant. | ) ) | |

### VERIFIED COMPLAINT

Plaintiffs 36 Builders, Inc., doing business as Insight Homes, and Insight Land Company, LLC (collectively, "Plaintiffs" or "Insight Homes"), by and through undersigned counsel, allege as follows for their complaint against Defendant, Jack Hutchins Haese ("Defendant" or "Haese"):

1.     This is an action to remedy breaches of an Employment Agreement and breaches of fiduciary duty committed by Haese during and after Haese's employment with Insight Homes.  Haese served as Insight Homes' Chief Financial Officer from September 30, 2016 through August 1, 2018.  While serving as a high level and trusted officer of Insight Homes, Haese breached his fiduciary duties by surreptitiously converting and attempting to convert Insight Homes' business opportunities for the benefit of himself and affiliated entities, and by using Insight

Homes' confidential business information to set himself up in competing ventures within Insight Homes' line of business.  Following the termination of his employment with Insight Homes in August 2018, Haese repeatedly breached post-employment obligations imposed by his Employment Agreement with Insight Homes.  In this action, Insight Homes seeks damages and/or equitable relief to remedy Haese's breaches of fiduciary duty, breaches of the Employment Agreement, and related conduct.

<u>THE PARTIES</u>

2.      Plaintiff 36 Builders, Inc., is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business in Bridgeville, Delaware.  Plaintiff Insight Land Company, LLC, is a limited liability company organized and existing under the laws of the State of Delaware, with a principal place of business in Bridgeville, Delaware.  Pursuant to a restructuring of Insight Homes' business undertaken on or about December 27, 2016, Insight Land Company, LLC, succeeded to certain rights and interests of 36 Builders, Inc., and since that date Insight Land Company, LLC, has served as the principal operating company for the Insight Homes land development business.  Insight Homes is a land developer and homebuilding company with operations in Sussex County, Delaware, and in the State of Maryland.

2

3.      Defendant Jack Hutchins Haese is a citizen of the State of Maryland, and resides in or around Arnold, Maryland.

JURISDICTION

4.      Subject matter jurisdiction is proper in this Court pursuant to 10 Del. C. § 341, because Plaintiffs assert a claim for breach of fiduciary duty, which arises in equity.

5.      This Court has personal jurisdiction over Defendant because Defendant's employment relationship with Plaintiffs was centered in Sussex County, Delaware, and the actions of Defendant complained of herein occurred substantially in Sussex County, Delaware.

FACTUAL BACKGROUND

6.      On or about October 12, 2016, Haese and Insight Homes entered into an Employment Agreement dated as of September 30, 2016 (the "Employment Agreement").  A true and correct copy of the Employment Agreement is attached hereto as Exhibit A.  Under the Employment Agreement, Insight Homes employed Haese as its Chief Financial Officer.

7.      Haese served as Chief Financial Officer of Insight Homes until August 1, 2018.  Haese also served as an officer of various entities affiliated with Insight Homes.  On or about July 16, 2018, Haese tendered his resignation to Insight Homes, indicating that it would be effective as of August 1, 2018.

8.     During the term of his employment with Insight Homes, Haese was integrally involved in the management of Insight Homes.  He had access to and helped to develop Insight Homes' business plans, by which Insight Homes would pursue opportunities to develop properties and build homes in Sussex County.

9.     Among other things, the Employment Agreement required Haese to preserve and protect Insight Homes' "Confidential and Proprietary Information", as defined in the Agreement, and to use or divulge such information only in the discharge of his duties as an executive of Insight Homes.  Employment Agreement § 4(a).

10.     The Employment Agreement includes a non-solicitation/non-compete provision (the "Non-Compete Provision").  Employment Agreement § 5.  The Non-Compete Provision provides that, for two years after the termination of his employment with Insight Homes, Haese was contractually prohibited from accepting employment with a competitor of Insight Homes.  Employment Agreement § 5(b).  The Non-Compete Provision further prohibits Haese, for a two-year period following the termination of his employment, from assisting any other person or entity with an acquisition or potential acquisition of any tract of land that had been identified by Insight Homes during the twelve-month period prior to Haese's termination of employment.  Employment Agreement § 5(c).  Further, the Non-Compete Provision includes a clause that prohibits Haese, for a two-year

4

period following the conclusion of his employment, from disparaging Insight

Homes or impugning the character or professionalism of any of Insight Homes'

officers, directors and employees.  Employment Agreement § 5(d)

11.     On or about July 16, 2018, Haese tendered his resignation as Chief

Financial Officer of Insight Homes, effective as of August 1, 2018.  Around the

time of his resignation, Haese informed Insight Homes' President, Robert M. Lisle

("Lisle"), that for personal reasons, he was unable to continue to work on a full-

time basis.  Unbeknownst to Insight Homes and Lisle at the time of Haese's

resignation, Haese had started preparing to compete with Insight Homes in the

market for residential development and homebuilding services in Sussex County,

Delaware.

12.     Contemporaneously with the execution of Haese's Employment

Agreement, Sequoia, LLC ("Sequoia"), a Maryland limited liability company

affiliated with Haese, entered into a consulting agreement (the "First Consulting

Agreement") with Insight Homes, effective as of September 30, 2016.  A true and

correct copy of the First Consulting Agreement is attached hereto as Exhibit B.

13.     Around the time of Haese's termination of employment with Insight

Homes effective as of August 1, 2018, Sequoia and Insight Homes entered into a

new consulting agreement, effective as of August 1, 2018 (the "Second Consulting

Agreement").  The Second Consulting Agreement terminated and superseded the

5

First Consulting Agreement.  A true and correct copy of the Second Consulting Agreement is attached hereto as Exhibit C.

14.    Prior to terminating employment with Insight Homes, Haese began making contacts in the Sussex County development community with the goal of competing with Insight Homes' business, directly and indirectly.

15.    On or around July 3, 2018 (while he was still an officer and employee of Insight Homes), Haese formed a Maryland limited liability company known as Charter Oak Investment, LLC ("Charter Oak").  Haese maintains a Linked In page stating that he is the "Partner/Managing Member" of Charter Oak and has served in that capacity since August 2018.

16.    Charter Oak competes with Insight Homes in the market for residential development services in Sussex County, Delaware, and adjoining areas. In the fall of 2018, Haese began actively competing with Insight Homes' business, in part through his Charter Oak entity.

17.    In late September 2018, Haese made contact with James Fuqua, Esquire and Timothy Willard, Esquire, two Sussex County attorneys who have business relationships with and have performed services for Insight Homes, to discuss Charter Oak and its business.  Somewhat brazenly, Haese used his Insight Homes email address to make such contacts.

6

18.     In late September 2018, Haese mis-scheduled a meeting with Messrs. Fuqua and Willard related to Charter Oak.  The business meeting proposed by Haese related to Chase Oaks, a project being developed by Charter Oak in Lewes, Delaware ("Chase Oaks").  Chase Oaks is located on the same road as a competing Insight Homes land development project near Lewes, Delaware, that is less than a mile from Chase Oaks.

19.     Due to a miscommunication concerning the meeting related to Charter Oak business, Mr. Fuqua showed up for a meeting in Georgetown, Delaware, when Haese had intended to schedule the meeting for Rehoboth, Delaware.  In an effort to make up for slighting Mr. Fuqua, Haese offered to send work related to an Insight Homes residential housing development to the attorneys.  By email dated October 1, 2018 Haese (again, using an Insight Homes email address), stated:

> I am sending Tim [Willard] another title order on a
> refinance of Hawthorne.  This will be a long order case,
> with 181 lot deliveries and a $2.5 million land loan, and
> new development debt of $7 million plus.
>
> I am trying to make a mends [sic] for my appointment
> screwup.

20.     "Hawthorne" refers to a residential real estate project undertaken and owned by an Insight Homes land development entity, Hawthorne Development, LLC, over which Haese had some supervision as a result of the Second Consulting Agreement of Sequoia and Insight Homes.

7

21.     In or around February 2019, Haese prepared a letter to Rick King, Regional Market Manager-Land Vice President with NVR, Inc. ("NVR"). An electronic version of the letter to Mr. King was stored on a laptop computer Haese used for his work as an employee of and consultant to Insight Homes. NVR is a homebuilder that operates in Sussex County, and Insight Homes has a variety of relationships with NVR, including through Insight Homes' sale of residential lots to NVR for new home construction. In 2018, NVR and an affiliate of Insight Homes entered into an agreement whereby Insight Homes would sell 175 finished lots to NVR in a development known as Anchors Run located in Sussex County, Delaware, with NVR intending to build homes on such lots and offer the homes for sale to the public. As an employee of Insight Homes, and later as a consultant to Insight Homes, Haese had been intimately involved in structuring the Insight Homes/NVR relationship with respect to the Anchors Run lots, as well as with Insight Homes' development of the Anchor Run property.

22.     In his February 2019 letter to Mr. King of NVR, Haese refers to services that Charter Oak could supposedly offer acting as a "captive developer" for NVR. In the letter to Mr. King, Haese uses the Anchors Run development (including Insight Homes' confidential pricing information and data) as an example of a "sample project" in which Charter Oak could do business with NVR. Haese's letter to Mr. King stated that "[a] very rough scenario can be applied in a

8

real live project composed of 265 lots with which you are familiar." Beneath that introductory sentence in his letter, Haese provided a comparison two "pro formas", one of which is based upon Insight Homes' Anchors Run project, and one of which is intended to argue that NVR could save money by using Charter Oak development services instead of purchasing lots developed by Insight Homes. Essentially, Haese used Insight Homes' confidential information to undermine Insight Homes' business relationship with its customer, NVR. On information and belief, the letter found by Insight Homes on the laptop computer used by Haese was sent in similar form on or around February 4, 2019.

23.     In or around March 2019, Haese exchanged a series of emails messages with Kenny McLendon, principal of a development firm McLean Partners, LLC, based in McLean, Virginia. The email messages – in which Haese used an Insight Homes email address – involved a "114 lot farm", which refers to approximately 56 acres of undeveloped property in Sussex County, Delaware, known as "Good Will Farm." Good Will Farm was owned by Gulfstream Development, LLC ("Gulfstream"), a company with which Insight Homes had done business. In fact, Insight Homes had purchased property directly across the road from Good Will Farm known as the Woodlands. Haese learned of Gulfstream and Good Will Farm as a result of his relationship with Insight Homes. Insight Homes would have welcomed the opportunity to purchase and develop Good Will

9

Farm, but Haese diverted the opportunity to purchase Good Will Farm from Insight

Homes for the benefit of himself or an affiliated entity.  In February 2019, Haese

used his Insight Homes email account to communicate with the Planning & Zoning

Manager for Sussex County about the status of a subdivision application related to

Good Will Farm.

24.     In the March 2019 email exchange of Haese and Mr. McLendon

concerning Good Will Farm, Mr. McLendon states that his "guys are ready to do

something in DE".  In his initial response to Mr. McLendon, Haese briefly

recognized the impropriety of using an Insight Homes email address to advance his

personal, competing business ventures, stating: "Careful on the email address.

Soon, I hope to have just one soon."  After experiencing a moment of self-

awareness, Haese promptly returned to his discussion with Mr. McLendon related

to his business interests, responding to Mr. McLendon that he would work up a pro

forma and that "NVR is all over me to sign a contract..."

25.     In or around May 2019, Haese prepared a letter to Jonathan Pentecost,

Division President for homebuilding company D.R. Horton.  An electronic version

of Haese's letter to D.R. Horton was found on the Insight Homes laptop computer

used by Haese.  D.R. Horton operates in Sussex County, Delaware.  Insight Homes

has numerous commercial relationships with D.R. Horton, and in May 2019, had a

contract to sell developed residential building lots in Maryland to D.R. Horton.  As

with his earlier pitch letter to NVR, Haese's letter to D.R. Horton compared the

Charter Oak services Haese was pitching to a project that involved Insight Homes,

and in the process, exposed sensitive business information of Insight Homes.  On

information and belief, the letter found by Insight Homes on the laptop computer

used by Haese was sent in similar form to D.R. Horton on or around May 1, 2019

26.     Haese actively and covertly pursued side-deals that are competitive to

and damaging to Insight Homes' business.  Additionally, Haese has used Insight

Homes' confidential information and resources, including confidential information

he acquired as an employee of Insight Homes, in seeking to advance his personal

interests at the expense of Insight Homes.

27.     In addition to engaging in competing conduct that negatively impacts

Insight Homes' business and relationships with partners and other participants in

the real estate development community in Sussex County, Haese has engaged in

conduct that disparages Insight Homes in the community, and projects Insight

Homes in a negative light.  In early 2019, while Sequoia (through Haese) was

serving as a consultant to Insight Homes pursuant to the Second Consultant

Agreement, Haese was designated to communicate with certain parties that might

be interested in purchasing real estate assets or an equity interest in Insight Homes.

Instead of performing such functions in a competent and loyal fashion, Haese acted

as a "double-agent" of sorts, attempting to advance his own interests or those of

11

related parties, while at the same time purporting to act as an agent of Insight Homes.

28.     In an email exchange with Larry Ochsman in February 2019, Haese disclosed his plans to pressure Lisle and Insight Homes into a coerced sale of Insight Homes, such that Haese or his partners would force a transaction on Lisle to take control of Insight Homes.  Mr. Ochsman is a development specialist who helps to arrange real estate transactions and deals.  In an email to Mr. Ochsman of February 20, 2019, Haese expressed his interest applying leverage to back Lisle "into a corner."  In passing along a communication with Mr. Pentecost of D.R. Horton that related to a potential transaction involving Insight Homes and D.R. Horton, Haese wrote to Mr. Ochsman:

> I think I would like to back Rob in a corner and tell him
> that I want to buy 80% of the stock of Insight.  I will get
> him an emergency capital loan of $5 million, secured by
> Hawthorne and warrants on the stock of Insight.  He will
> have a passive role, holding 20% interest, and available
> as a consult only.  I will bring in the suiter, help them dig
> through everything, and play a role in transition if they
> want.  If they want me to consult after, would do that as
> well.
>
> But, it will be their bat, their ball, their glove, and they
> pick the rules.  No more fancy footwork and BS.

12

29.     As the above statements illustrate, Haese attempted to use his trusted status with Insight Homes to leverage an advantage for himself to the detriment of Insight Homes and its principal owner.

30.     As a result of Haese's conduct as alleged above, Insight Homes has suffered and continues to suffer damage and injury, including lost business opportunities and damage to Insight Homes' reputation in the business community.

## COUNT I – BREACH OF FIDUCIARY DUTY

31.     Plaintiffs repeat and incorporate by reference the allegations of paragraphs 1 through 30 of this Complaint above.

32.     During his employment as a senior officer of Insight Homes, Haese owed a fiduciary duty of loyalty to Insight Homes, and after the conclusion of his employment, Haese owed a fiduciary duty to Insight Homes to maintain and protect confidential information of Insight Homes he obtained during the course of his employment.

33.     The conduct of Haese, as alleged above, constitutes a breach of fiduciary duties that Haese owed to Insight Homes as an officer and employee, and as a former officer and employee, including the duty of loyalty and the duty to maintain confidentiality of Insight Homes' business information and assets.

13

34.    Haese's actions were willful, without justification, committed through improper means, and have proximately caused injury to Insight Homes, and will continue to cause injury to Insight Homes.

## COUNT II – BREACH OF CONTRACT

35.    Plaintiffs repeat and incorporate by reference the allegations of paragraphs 1 through 34 of this Complaint above.

36.    Haese has violated the terms of the Employment Agreement, and specifically the Non-Compete Provision, by engaging in conduct that is competitive to Insight Homes during the non-compete period provided by the Non-Compete Provision and by engaging in conduct that has tended to disparage Insight Homes and its management.

37.    Haese has further violated the Employment Agreement by utilizing the confidential information of Insight Homes to advance his personal business ventures that compete with Insight Homes and its activities in the real estate development and homebuilding market in and around Sussex County, Delaware.

38.    As a result of Haese's breaches of the Employment Agreement, Insight Homes has suffered damages, including but not limited to lost profits and loss of business value, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs 36 Builders, Inc., doing business as Insight Homes, and Insight Land Company, LLC, respectfully request that the Court:

A.   Enter judgment in favor of Plaintiffs and against Defendant on all claims;

B.   Award Plaintiffs compensatory damages in an amount to be proven at trial;

C.   In the alternative or in addition to awarding compensatory damages, order a constructive trust over any and all profits Defendant has secured directly or indirectly as a result of the breaches of fiduciary duty and contract as alleged herein;

D.   Award Plaintiffs their attorneys' fees and costs of suit in connection with this action; and

E.   Award Plaintiffs such other and further relief as this Court deems just and proper.

FAEGRE DRINKER BIDDLE & REATH LLP

/s/ *Joseph C. Schoell*
Joseph C. Schoell (Del. Bar No. 3133)
222 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Tel: (302) 467-4200
Email:  joseph.schoell@faegredrinker.com

*Attorneys for Plaintiffs 36 Builders, Inc.,*
  *doing business as Insight Homes, and*
  *Insight Land Company, LLC*

October 8, 2020

16

EFiled:  Oct 08 2020 12:59PM EDT
Transaction ID 66002606
Case No. 2020-0861-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

36 BUILDERS, INC., a Delaware )
corporation, doing business as )
INSIGHT HOMES, and INSIGHT )
LAND COMPANY, LLC, a Delaware )
limited liability company, )                                 C.A. No. _____
)
        Plaintiffs, )
)
    v. )
)
JACK HUTCHINS HAESE, )
)
        Defendant. )

## **VERIFICATION**

Pursuant to 10 *Del. C.* § 3927, I, Robert M. Lisle, declare that:

1.      I am the President of Plaintiff 36 Builders, Inc., and a member of

Plaintiff Insight Land Company, LLC.  I am authorized by Plaintiffs to provide this

Verification.

2.      I have reviewed the Verified Complaint filed in this action and, to the

best of my knowledge, information and belief, the statements made therein are true

and correct.

3.      I declare under penalty of perjury of the laws of the State of Delaware

that the foregoing is true and correct.

Executed on the __ day of October, 2020.

_____
Robert M. Lisle

EFiled:  Oct 08 2020 12:59PM EDT
Transaction ID 66002606
Case No. 2020-0861-

# EXHIBIT A

## EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (hereinafter referred to as "Agreement") is entered as of the date of the last signature affixed hereto by and between **36 BUILDERS, INC.**, a Delaware corporation, doing business as (hereinafter referred to as "Insight Homes" or the "Company") and **JACK HUTCHINS HAESE** (hereinafter referred to as the "Executive").

      **A.**     Insight Homes and the Executive have discussed the opportunities of employment available at Insight Homes, and both the Company and the Executive agree that the Executives employment with the Company would be beneficial to both parties.

      **B.**     Insight Homes and the Executive have agreed to enter into an agreement to recite the terms and conditions of the Executive's employment, the expectations and duties he is expected to perform, and the compensation and other benefits to be provided by the Company.

**NOW, THEREFORE,** in consideration of the recitals herein, and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged by each of the parties, the parties do hereby agree as follows:

1.     **Employment Duties and Responsibilities**

     (a)     Insight Homes hereby agrees to employ the Executive as Chief Financial Officer, and an officer of the operating company, and the Executive hereby accepts such position and agrees to serve Insight Homes in such capacity during the employment period set forth in Section 3 hereof, subject to earlier termination as provided hereunder (the "Employment Period"). Executive shall fulfill, to the best of his abilities, those job duties set forth on Attachment A hereto, as well as any and all other duties as may be assigned that are consistent with his expertise and training. Insight Homes hereby retains the right to modify the Executive's job title and responsibilities pursuant to the legitimate business needs of the Company, provided that any such modification in title or responsibilities is consistent with the Executive's expertise and training and does not constitute a substantial and material diminution in the Executive's compensation.

     (b)     The Executive shall report to the President and the CEO of Insight Homes (the "Executive's Manager"), although Insight Homes retains the right to modify the Executive's reporting relationship pursuant to the legitimate business needs of the Company. The Executive shall be subject to, and shall act in accordance with, all reasonable legal instructions and directions of the Executive's Manager which are consistent with the above position and commensurate with duties and responsibilities of similar level executives of corporations comparable to Insight Homes, as well as any other duties as may from time to time be reasonably assigned by Insight Homes that are commensurate with Executive's position.

     (c)     The Executive agrees to abide by all applicable policies and rules of Insight Homes.

     (d)     During the Employment Period, the Executive shall at all times operate in accordance with the Insight Homes Employee Handbook, a copy of which has been provided to

Executive at the time of commencement of the Employment Period, and may not, without the prior written consent of the President of Insight Homes, operate, participate in the management, operations or control of, or act as an employee, officer, consultant, agent or representative of, any other entity or business that is not related to Insight Homes, provided that it shall not be a violation of the foregoing for the Executive: (i) to act or serve as a director on the boards of directors of any type of non-profit civil, cultural, philanthropic or professional organization; (ii) to manage Executive's own personal passive investments; or (iii) to serve, with the written consent of the Executive's Manager, on the board of directors of for-profit entities, so long as such activities do not compete with or materially interfere with the performance of Executive's duties and responsibilities to Insight Homes as provided hereunder.

2.    **Compensation**

(a)    *Base Salary.* As compensation for the performance by the Executive of Executive's obligations hereunder, Insight Homes shall pay the Executive an annualized base salary of ONE HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($150,000), to be hereinafter referred to as "Base Salary," which shall be paid in accordance with the normal payroll schedule of the Company. Salaries are normally reviewed annually and may be increased solely in the discretion of Insight Homes.

(e)    *Business Expenses.* During the Employment Period, the Executive shall be entitled to reimbursement of reasonable business-related expenses upon presentation of appropriate invoices, subject to the policies and procedures established by Insight Homes from time to time.

(f)    *Vacation.* During the Employment Period, the Executive shall be entitled to a vacation to be governed by Insight Homes' written vacation policy as set forth in the Insight Homes Employee Handbook. Executive shall also be entitled to leave on all holidays normally observed by Insight Homes.

(g)    *Taxation of Compensation.* Except where expressly permitted by the Internal Revenue Code ("IRC"), the compensation provided in this Agreement shall be treated as taxable wages under the IRC, and Insight Homes shall withhold from any such amounts all required withholdings or deductions.

(h)    The Executive shall provide for and pay the expenses of premiums due for his own health, dental, disability, and/or life insurance, and the Company shall not be liable for any of these expenses, and shall be held harmless for any liability associated with the Employee's willful waiver of any Company provided insurance.

3.    **Employment Period**

(a)    The Employment Period commencement date September 30, 2016 (the "Effective Date"). Notwithstanding anything contained herein to the contrary, the Company and Executive acknowledge that the Executive's employment with the Company is AT-WILL.

(b)    *Termination by Insight Homes Without Cause.* Insight Homes may terminate the

Executive's employment at any time, for any reason, and without Cause (as defined below). In the event that Insight Homes terminates Executive's employment hereunder without Cause, Insight Homes shall provide the Executive with two (2) weeks' severance pay. Any and all severance pay and/or benefits are conditioned upon and subject to the Executive executing a valid general release and waiver in a form acceptable to Insight Homes, waiving all claims the Executive may have against Insight Homes, and all of its respective subsidiaries, affiliates, directors, officers, employees, shareholders and agents other than rights of indemnification, rights to directors and officers insurance, and any rights to accrued benefits under the employee benefit plans.

(c)   *Termination by Insight Homes for Cause.*   Insight Homes may terminate Executive's employment immediately for "Cause," in which case Executive shall receive only Executive's Base Salary and normal benefits though the last day of Executive's active employment. For purposes of this Agreement, the term "Cause" shall include but not be limited to termination based on any of the following grounds: (i) fraud, misappropriation, embezzlement or acts of similar dishonesty; (ii) illegal use of drugs or excessive use of alcohol in the workplace; (iii) intentional and willful misconduct that may subject the Company to criminal or civil liability; (iv) breach of the Executive's duty of loyalty, including the diversion or usurpation of corporate opportunities properly belonging to the Company; (v) willful disregard of Company policies and procedures; (vi) breach of any of the material terms of this Agreement; and (vii) insubordination or the willful and continued failure by the Executive to substantially perform Executive's duties with Insight Homes (other than any such failure resulting from Executive's incapacity due to physical or mental illness), provided, however that Insight Homes shall not terminate this Agreement under subsection (vii) until after a written demand for substantial performance is delivered to Executive by Insight Homes, which specifically identifies the manner in which Insight Homes believes that the Executive has not substantially performed Executive's duties, and Executive's failure within 30 days to cure such insubordination or failure to perform.

(d)   *Termination by Executive Due to Voluntary Resignation.*   The Executive may terminate Executive's employment hereunder by voluntarily resigning Executive's employment and providing Insight Homes with thirty (30) days' prior notice of such resignation.

(e)   *Termination by Death or Disability.*   Executive's employment shall terminate if the Executive is unable to perform the duties of Executive's position due to death or disability. In such case, the Executive's heirs, beneficiaries, successors, or assigns shall not be entitled to any of the compensation or benefits to which Executive is entitled under this Agreement, except as provided in Section 3(b) above. For purposes of this Agreement, the term "Disability" shall mean that, as a result of the Executive's incapacity due to physical or mental illness, the Executive shall have been unable to substantially perform Executive's duties hereunder for a period of four (4) consecutive months or 120 days within any 180 day period.

4.   **Nondisclosure of Proprietary and Confidential Information.**

(a)   The Executive acknowledges that in the course of the Executive's employment hereunder, the Executive will be making use of the Company's Proprietary and Confidential Information as defined below. The Executive agrees that while employed by the Company and upon and after the cessation of the Executive's employment with the

Company for any reason whatsoever, the Executive, except in the discharge of his duties with the Company, shall not, for any reason or purpose whatsoever, directly or indirectly, divulge or disclose to any person or entity any of the Proprietary and Confidential Information learned or conceived by the Executive while in the employ of the Company. Upon the cessation of the Executive's employment with the Company for any reason whatsoever, the Executive shall return to the Company all Proprietary and Confidential Information (whether furnished by the Company or prepared by the Executive) in the Executive's custody, possession or control, and the Executive shall neither make nor retain any copies of any of such Proprietary and Confidential Information after such cessation.

(b)     For purposes of this Agreement, the term "Proprietary and Confidential Information" shall include (a) information regarding the Company's business operations, internal structure and financial affairs; (b) information regarding the Company's confidential reports and lists of former, present and prospective customers, vendors, suppliers and employees or containing information pertaining to the business needs of these customers, contractors, sub-contractors and suppliers; (c) information regarding the Company's land acquisition plans, including without limitation the identity and location of property under contract, negotiation or under investigation or speculation by the Company; (d) information pertaining to the Company's present or future prices, discount and pricing policies and procedures, sales and marketing goals, business strategies and techniques; and (e) the pricing structure of the Company's goods and services and other products.

5.     **Non-Solicitation/ Non-Compete.** While the Executive is employed by the Company and for a period of two (2) years after the cessation of the Executive's employment with the Company for any reason whatsoever, the Executive shall not, for the benefit of Executive or for the benefit of any other person or entity, directly or indirectly:

(a)     Solicit or induce or persuade to leave the employ of the Company, or assist others in engaging such solicitation, or hire for any reason or purpose whatsoever, any person who (i) who was an employee of the Company at the time of such solicitation or hiring or (ii) had been an employee at any point in the six-month period prior to such solicitation or hiring. This means, among other things, that if the Executive's employment with the Company terminates (whether voluntary or involuntary), Executive shall refrain for two years from disclosing to any person or entity the names of his former fellow employees where the purpose or reasonably foreseeable result of such disclosure is to allow such person or entity to solicit Company employees for employment.

(b)     Accept employment from a competitor based, or conducting business in, the Del Marva Peninsula, a "competitor" being defined as a company that is engaged in the business of building and selling single family or multi-family housing, whose clientele would be similar to those currently being solicited by the Company.

(b)     Solicit for the purpose of selling any Customer or Prospective Customer a residential home. For purposes hereof, "Customer" shall mean any person to whom the Company has sold a home in the prior three years, and "Prospective Customer" shall mean any person with whom the Company interacted or discussed selling a residential home in the 12 months prior to Executive's departure from the Company, including without limitation any person who provided his/her name to the Company for the purpose of

receiving information regarding the Company's residential homes.

(c)  Participate in or assist any other person or entity in the potential acquisition of any part of a tract of land which was identified by the Company for possible acquisition by the Company at any time in the 12 months prior to Executive's departure from the Company.

(d)  Disparage, defame, impugn, or otherwise damage or assail the reputation, integrity or professionalism of Insight Homes, or any officer, director, employee, agent or representative of Insight Homes, or any entity in which any of the foregoing or Insight Homes is either a managing member or member.

(e)  If any court should hold the time period or geographical scope of the covenants set forth herein to be unreasonable, or otherwise unenforceable, the parties expressly agree that the covenants set forth herein shall be enforced to the extent that would otherwise be deemed reasonable or enforceable.

6.  **Assignment of Inventions and Confidential Information.** Employee agrees that his services on behalf of the Company and any product, formula, strategy or like creation developed or refined by Employee during the period of his employment with the Company which relates in any manner to the business of the Company are works made for hire. Employee agrees that all such inventions and confidential information shall be the sole property of the Company and its assigns, including patents, copyrights, trademarks, trade secrets, and other proprietary rights and protections connected therewith. Employee hereby assigns to the Company any and all rights he now has or may hereafter acquire in such Inventions.

7.  **Remedies for Breach.** Executive expressly agrees that any breach or threatened breach by the Executive of the provisions of this Agreement would cause irreparable injury to the Company, and there is no adequate remedy at law for such violation. In such event, the Company shall have the right, in addition to any and all other remedies available at law or in equity, to enjoin the Executive in a court of equity from violating such provisions. Executive also agrees that should a court of competent jurisdiction find that Executive has engaged in a breach or threatened breach of any of the provisions of this Agreement, Executive shall, in addition to any other damages proven, be liable to the Company for reasonable attorneys' fees and costs incurred in bringing such action to enforce the terms of this Agreement.

In the event that the Company shall enforce any part of this Agreement through legal proceedings, Executive agrees to pay the Company any costs and attorneys' fees reasonably incurred in connection therewith.

8.  **Miscellaneous.**

(a)  *Binding Effect, No Waiver.* The Agreement is binding upon, and shall inure to the benefit of, the Company and the Executive, and their respective heirs, personal and legal representatives, successors and assigns. No waiver of any term of this Agreement shall be valid or binding unless in writing signed by an authorized officer of the Company. The obligations set forth herein are personal in nature, and this Agreement shall not be assignable in whole or in party by Executive without the prior written consent of the Company.

(b)    *Entire Agreement.* This Agreement contains the entire agreement and understanding between the parties hereto, and no modification hereof shall be binding unless in writing and signed by both the Executive and a duly authorized officer of the Company. The Company and the Executive hereby rescind and terminate any and all prior Agreements between them in respect of the employment of the Executive by the Company (including but not limited to any limited liability company in which Insight Homes shall be a member) and neither party thereto shall have any further rights, obligations or duties thereunder provided that each party shall remain liable and responsible to the other for all prior obligations and duties thereunder and for all acts and omissions of each party prior to such rescission and termination.

(c)    *Severability.* The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.

(d)    *Governing Law.* This Agreement shall be governed by the laws of the State of Delaware.

(e)    *Amendments: Entire Agreement.* This Agreement may not be amended or modified except by a writing executed by all of the parties hereto. This Agreement, including any addendums hereto, constitutes the entire agreement between Executive and the Company relating in any way to the employment of Executive by the Company, and supersedes all prior discussions, understandings and agreements between them with respect thereto. If any provision of this Agreement is held to be unenforceable for any reason, it shall be adjusted rather than voided, in order to achieve the intent of the parties to this Agreement to the extent possible. In any event, all other provisions of the Agreement shall be deemed valid and enforceable to the full extent possible.

(f)    *Survival.* The rights and obligations under this Agreement shall survive the termination of Executive's service with the Company in any capacity to the extent contemplated by each relevant section.

**EXECUTIVE**                                    **36 BUILDERS, INC.,**
                                                 **A DELAWARE CORPORATION,**
                                                 **DBA INSIGHT HOMES**

Jack Hutchins Haese          Date               By: _____     10/6/16
                             10-12-2016                                          Date

                                                 Title: _____Owner_____

<u>**Attachment A to Employment Agreement of Jack H. Haese**</u>

**Insight Homes**
**Job Description**

<u>**CFO Responsibilities**</u>

I)   **Priority Activities - CFO**
   A.   <u>Solicit, negotiate and close all debt and equity transactions</u>
      1.   Prepare offering package for debt and equity lenders
      2.   Finalize cash flow from proforma to incorporate actual deal points per term sheet or commitment letter
      3.   Accumulate initial checklist requirements for package
         a.   Environmental Reports
         b.   Title Report and Schedule "B" items
         c.   Order/supply Appraisal Information
         d.   Soil Reports/Geo Tech Reports
         e.   Product Mix, Options, Specs
         f.   Hard Costs Budgets
      4.   Negotiate Terms of Loan and Guaranty
         a.   Limited Guaranty v. Corporate Guaranty
         b.   Leverage Ratio Calculations
         c.   Loan Sizing and Release Calculations
      5.   Coordinate Attorney Activities for Closing
         a.   Finalize collection of all Lender checklist items
         b.   Review Terms and Conditions of Loan Documents and formulate alternative language for execution by Managers
         c.   Assure conformity of Term sheet or Commitment to Final Loan Documents
         d.   Review and execute Closing Statements
      6.   Homeowners Association Documentation
      a.   Select and work with Counsel to prepare appropriate documentation for the establishment of the HOA and all required exhibits for the Marketing Department
      b.   Secure all supporting exhibits (title, easements, etc.) from the engineers for the associated exhibits required in the HOA disclosure.
      c.   Interview/select the Management Company and supervise/audit/consult on the preparation of the initial budget
      d.   Maintain corporate charter documents and Architectural Committee Minutes and other Corporate Documents until turnover of the HOA

   B.   <u>Analyze Starts and Closings Projections to assure sufficient Liquidity Maintenance</u>
      1.   Maintain Master Closing Log as a Master Cash Flow Generator based upon information obtained from Operations Meetings
      2.   Assimilate/compare starts with Project Models to adjust annual Profit Projections and derivative Cash Flow

      3.    Link Cash Flows to Master Liquidity Projections for Liquidity and Cash availability

C.    <u>Cash Flow Preparation/Project Modeling</u>

    1.    Prepare initial Feasibility Cash Flow Projections from information provided by Department Heads

    2.    Calculate Loan and Equity Requirements based upon initial information provided

    3.    Present initial results in Feasibility meetings for comments, corrections and update

    4.    Participate in 'Go'/"No Go" decisions on new projects and review pricing memos to update sales revenues.

    5.    Consult with department head after monthly variance review to determine Budget revisions and update Cash Flows on acquired projects to project financial results and profitability.

    6.    Forecast financial projections changes to evaluate revised pricing and sales strategies

    7.    Post all revenue results from sales of units and options and update reports on monthly variances

D.    <u>Loan Administration</u>

    1.    Maintain all financial reports required by lenders and equity participants

    2.    Coordinate additional takedowns and sales, in accordance with sales contracts and loan terms

    3.    Negotiate and prepare extension documents

    4.    Submit financial statements on dealings and prepare/analyze leverage and liquidity ratios

    5.    Submit and/or forward weekly Marketing Meeting Minutes and Flash Reports to all Investors and active Banking Relationships

    6.    Prepare once annually (by April 1) all of the personal financial statements of the Guarantor Shareholders and submit to the Banking Relationships.

E.    <u>Maintain Minimum Liquidity Availability</u>

    1.    Review daily Cash flow position and analyze variance/change from latest projections

    2.    Recast Liquidity Report based upon changes in closings from delays or amendments in Projected Revenues

    3.    Negotiate and maintain sufficient borrowing lines of credit to meet emergency liquidity and maintain tax schedules. Meet minimum liquidity levels for Covenant Requirements.

II.    **Management Responsibilities – Operations**

A.    <u>Corporate Accounting</u>

    1.    Manages Controller and accounting staff to produce monthly financial reports in conformity with GAAP requirements

    2.    Coordinate assessment of contra cost and hard costs against individual unit closings

    3.    Oversee with test reports the Controller and accounts payable to assure full costs assimilation to each unit sold.

    4.    Run ODBC link for hard cost comparison between Cash flow and actual Contra/Hard Cost schedules in Timberline.

    5.    Assemble accounting staff twice monthly to monitor accounts payable credits (back-charges) and clearing of stale balances.

6. Review and assist in cost coding for legal invoices and specialty invoices against GL accounts.
7. Oversee preparation of all financial statements for holding company and each affiliate
8. Recommend write-down/write off changes to the financial statement to maintain financial statement integrity
9. Meet with delineate to the auditing firm scope of engagement and recommend areas of special emphasis for interim and annual audits
10. Prepare and discuss tax strategies with corporate auditors – update tax data with earnings projections on a periodic basis
11. Maintain master tax entity schedule to assure proper K-1 distribution to share holders
12. Certifies Financial statements and tax returns for all banks and confirm/certify loan covenant adherence
13. Prepares overhead budget based upon input from management

B. <u>Investment Evaluation – Projections</u>
   1. Participate in regularly scheduled meetings as required and prepare appropriate report updates
      a. Operations Meeting – Closing and Starts Log Revenue Calculation
      b. Feasibility Meeting – Update all Cash flows for Projects in

      Consideration- isolate deficiency information and input new data from department heads
      c. Fin-Com Meeting – Update all cash flows with latest revenue and cost accounting and update projected profit and loss per job.
      d. Distribute Financial Statements for shareholder review (quarterly)
   2. Attend new project evaluation meetings as required

C. <u>Land Contract Administration</u>
   1. Maintain/Organize Land Contract file to capture necessary evaluation items
      a. Amendments - Extensions
      b. Title Reports and Historical Title Issues
      c. Soils and Geo-Tech Reports
      d. Correspondence with council and seller
   2. Establish Timeline for contract Requirements
      a. Cash deposits- Initial Earnest Money
      b. Letters of Credit- Submit applications and supporting documentation for Letters of Credit that may be required as earnest money deposits
      c. Option or Earnest Money Deposits- Maintain the scheduled payments to prevent default and termination
   3. Monitor Accounting Compliance with monetary deadlines for payments (Calendar)
   4. Draft correspondence to individual sellers
   5. Monitor compliance with contract terms before, during and after settlement
D. <u>Risk Management/Health Benefits</u>
   1. Develop RFP for Builder's Risk and Liability Insurance packages for reputable insurance sources to bid

2. Meet with insurance agents to discuss depth and spread of insurance plans against perceived corporate risk
3. Evaluate health, dental, life & disability proposals prior to annual Open Enrollment
    a. Chart cost increases, potential savings
    b. Assist management in selection of best suited    package
4. Maintain loss payee endorsement list for coverage of entities
5. Consult with agent and make recommendations to management for additional risk coverage (potential increase to multiple loss exposure, etc.)
6. Secure competitive bid proposals for affiliate insurance packages (hotel, PCI Florida, etc.)
7. Secure Workmen's Compensation package for all entities
8. Maintain loss report runs and files proper and timely loss claims
9. Act as initial contact person for loss claim for theft, fire, and injury.
10. Work with insurance company assigned counsel for defense claims (non-quality control related claims) and litigation/subrogation of claims for company loss

E. **Legal Defense/Litigation Management**
1. Work with corporate counsel in defense of claim made against Holding Co. or affiliates
2. Develop charts, graphs, worksheets, etc. in support of legal defense from corporate reloads and timberline
3. Prepare interrogations and document discovery checklists per counsel's instruction
4. Monitor and analyze legal defense costs
5. Appear in court hearings, depositions and other litigation related meeting and proceedings

F. **Bond Line Administration**
1. Negotiate and close Bonding Lines for Land Development
2. Prepare and submit annual renewal packages, with financial exhibits in support of current bond exposure
3. Evaluate new bonding line proposals and make recommendation for corporate approval
4. Assist Land Development in the preparation of County Bond Packages, and review Best Ratings on Sureties to meet County standards for financial responsibility
5. Monitor Surety Report to assure minimum standards set by local counties

G. **Builder Registration**
1. File initial renewal applications for all Operating entities
2. Calculate and transmit filing fees

III. **Management Responsibility – Entity and Tax**
A. **Entity Management**
1. Prepare and file Articles of Incorporation or Articles of Organization dependent upon desired tax schedule
2. Prepare by-laws or operating agreement to complete corporate package
3. Secure shareholder signatures on corporate documents

    4.       Issue stock shares and maintain stock ledgers authenticating ownership

    5.       Consult with tax accountants to secure best tax advantage for entity selection and operational goal

    6.       Draft and cause the execution of all amendments, stock grants, shareholder agreements, etc., as such may be needed

    7.       Maintain all distribution schedules and reconciliation of Equity Accounts (Account 3250)

**B.**    <u>Tax Administration</u>

    1.       Manage preparation of all tax related requirements of Holding company and actual or related affiliates

        a.       Personal Property Tax returns

        b.       Tax returns – 1065, 1040, etc.

        c.       Application for EIN

        d.       Application for SUB-S Status (2553)

        e.       Application for Q-SUB election

        f.       REV-PROC application for disregarded tax entity basis

        g.       Distribution of all K-1 reports in observance of statutory deadline

        h.       Project Tax Requirements by 9/30 of each year, and determine current and projected Safe Harbor payments for each individual partner

        i.       Maintain record of checks and vouchers submitted for each partner, and work with accountant during tax preparation to record all payments made.

    2.       Monetary Tax Requirements and Reporting

        a.       Consult with auditing to secure accurate schedules of all estimated actual tax payment requirements for "safe harbor" and final returns

        b.       Secure accurate voucher payment schedules and distribute to shareholders to meet payment deadlines to avoid penalties

        c.       Consult with tax accountant to obtain most advantageous treatment of K-1 losses from entity levels

        d.       Maintain schedules of payments and copies of all checks submitted to IRS

        e.       Report associated individual tax liability

        f.       Maintain promissory notes and reconciliation of shareholder loan accounts

        g.       Meet with all support tax accountants in the development of all corporate and individual tax refunds and all "in house" returns filed by controller

        h.       Sign off on tax returns and tax filings as responsible officer as required

# EXHIBIT B

## CONSULTING AGREEMENT

**THIS CONSULTING AGREEMENT** (this "Agreement") is effective as of the _30th___ day of September, 2016, by and between 36 BUILDERS, INC., a Delaware corporation, doing business as Insight Homes ("Insight"), and Sequoia, L.L.C., a Maryland limited liability company ("Consultant").

**WHEREAS,** Insight desires that the Consultant provide certain consulting services ("Services") for the benefit of Insight and its affiliated entities, related to the identification, feasibility, pro-forma and development cost analysis, software integration and maintenance, and other assistance in the acquisition and development of real estate related assets in markets within and outside of the State of Delaware, as determined by Insight based on consultation with Consultant, and Consultant has agreed to provide such Services pursuant to the terms and conditions of this Agreement.

**NOW, THEREFORE,** for and in consideration of the premises herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

1. <u>Services</u>. The Services shall include identifying potential assets or pools of assets for acquisition and assisting Insight with analysis, underwriting, and implementation of a financial reporting strategy to be implemented during the development of the project or identified asset. When Insight obtains a contract to acquire an asset, Consultant shall work with Insight to develop, refine, and implement a development and delivery to construction plan in keeping with the established investment strategy for the subject asset(s). Initially the focus of consultant shall be on real estate related assets including residential building lots and land entitled, or to be entitled, for residential development within the Sussex County, DE, area; however, the parties hereto may modify the scope of services by mutual agreement at any time to include additional market areas in other states. To facilitate Consultant's performance of the Services, Insight shall provide Consultant, without charge, (only to the extent same is not provided by another party) with the use of an office and ancillary facilities (including computer and email services/address) within Insight' office premises, and reasonable assistance of any available support staff during the term of this Agreement.

2. <u>Consulting Fees - Rate</u>.

In consideration of the Consultant providing the Services to Insight in a manner and amount reasonably satisfactory to Insight, Insight agrees to pay Consultant a

consulting fee of FIFTY THOUSAND AND NO/100 DOLLARS ($50,000) annually during the term hereof ("Consulting Fee"), commencing on the effective date hereof. The Consulting Fee shall be payable in installments of $1,923.00 every two weeks during the term of this Agreement. It is understood that the consultant will be prohibited from working on other business or personal endeavors and that the Consultant will dedicate the full amount of his time to perform the services hereunder, and shall remain subject to the confidentiality agreement, attached hereto as Exhibit "A" and incorporated herein by reference, executed between the parties.

3.      Incentive Fee- It is the desire of Insight to expand the market areas of the company, in times and in a manner that it is deemed consistent with the business plan of the company. This expansion will entail out of town/out of state travel, and may also require weekend and holiday work to accomplish the expansion goal. Consultant will assist in the development of a business plan in which the base consulting fee shall be a cost of the expansion into other markets, and shall be costed out to different divisions as such may be established. Upon the successful start-up of these separate divisions, Insight shall prepare operating statements for these divisions. Consultant shall be responsible for all debt and equity creation in these new area markets, and shall assist in their management. To compensate the Consultant for this additional responsibility, Consultant shall be paid an incentive fee equivalent calculated as follows:

    a) After all divisional expense have been allocated, including the accrued base Consulting Fees accumulated until start-up, and such expenses shall have been fully recovered by Insight, then,
    b) Consultant shall receive an annual Incentive Fee equivalent the lesser of One Percent (1%) of the Gross Revenue of the out of state division, or Five Percent (5%) of the Net Revenue, each calculated before tax, and to include third party interest and other costs associated with standard GAAP accounting principles, on a cost basis.

3.      Agents and Commission. Insight and the Consultant each warrant to the other that neither has dealt with an agent, broker or finder with respect to the parties entering into this Consulting Agreement. In the event any claim for commission or finder's fee is brought by any person or entity as a consequence of the foregoing representation not being accurate, then the party whose acts give rise to such claim shall indemnify and hold harmless the other party against any loss, cost or expense of any nature, including, but not limited to, court costs and reasonable attorneys' fees, arising as a consequence of the claim for a commission or fee.

4.      Representations and Warranties by Consultant. Consultant has the power and authority to enter into this Agreement and perform its obligations hereunder; the performance by Consultant of its obligations hereunder does not and will not violate

any law; and neither this Agreement nor the performance by Consultant of its obligations hereunder violates any agreement or contract to which Consultant is bound or a party. This Agreement is binding upon and enforceable against Consultant in accordance with its terms.

5. <u>Indemnification</u>. As specifically provided for and limited hereby, Consultant shall protect, defend, hold harmless, and indemnify Insight and its partners, affiliates, successors, heirs, assigns, directors, officers, employees and agents from and against all claims, actions, liabilities, damages, losses, costs and expenses (including court costs and attorneys' fees) arising out of or incidental to the performance by Consultant of any duties and obligations pursuant to this Agreement, or any breach by Consultant of the representations and warranties of Consultant under this Agreement; provided, however, that such indemnification shall be strictly limited to the actual damages suffered and shall in no event exceed the total fees paid Consultant in accordance with this Agreement. The foregoing indemnification shall survive the expiration or termination of this Agreement.

6. <u>Term</u>. The term of this Agreement ("Term") shall commence on September 30, 2016, and shall remain continually valid and enforceable, provided however, either party may terminate this agreement on sixty (60) days prior written notice to the other party hereto. It is understood and agreed that in the event this Agreement is terminated by either party the Consultant shall still be entitled to receive any unpaid portion of his Consulting Fee as set forth herein. All matters related to the Confidentiality Agreement shall remain in full force and effect, even in the event of a termination of this Agreement.

7. <u>Non-Compete</u>- Solicit or obtain consulting contracts from a competitor based, or conducting business in, the Del Marva Peninsula, a "competitor" being defined as a company that is engaged in the business of building and selling single family or multi-family housing, whose clientele would be similar to those currently being solicited by the Company.

8. <u>Notice.</u> All notices and other communications hereunder shall be in writing and be deemed duly given if personally delivered, telecopied with proof of receipt, or sent by nationally recognized overnight courier, or mailed by certified mail, return receipt requested, postage prepaid:

        If to Insight:        Insight Homes
                                  16255 Sussex Highway
                                  Bridgeville, DE

h.    In the event litigation is initiated to enforce rights hereunder, the parties hereto agree that Insight shall be entitled to recovery of all of its litigation expenses, including reasonable attorneys' fees and costs, should it be determined to be the substantially prevailing party.  The parties hereto hereby consent to the jurisdiction of the Circuit Court of Sussex County, DE, with regard to any litigation arising out of this Agreement, and hereby waive their right to a jury trial.

WITNESS the following signatures and seals:

36 BUILDERS, Inc.,                              Sequoia, L.L.C.,
A Delaware corporation                       a Maryland limited liability company

By: _____       By: _____

Its: ___OWNER_____          Its: __MANAGING MEMBER___

## CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT

This Confidentiality and Nondisclosure Agreement ("Agreement") is made and entered into effective as of this __28th____ day of September, 2016, by and between 36 Builders, Inc., a Delaware corporation, dba Insight Homes ("Insight") and Sequoia, L.L.C., (the "Recipient") for the purpose of memorializing the terms and conditions under which Insight has agreed to provide Recipient with certain confidential and proprietary information of Insight.

WHEREAS, a Consulting Agreement has been executed by and between the parties hereto, whereby confidential financial and corporately sensitive information (the "Confidential Information") shall be disclosed to Recipient and its Representatives during the performance of its duties during the term of the Consulting Agreement; and

WHEREAS, Insight is willing to disclose the Confidential Information to Recipient and its representatives at its discretion in consideration of, and as a condition to the following:

1.    Confidential Information is defined as follows: all information, whether written, electronic or oral, disclosed by Insight to Recipient or its Representatives, including without limitation, all corporate operating data and structure, know-how, trade secrets, and any other information related to the business of Insight including without limitation, business plans, financial and accounting information, pro formas and projections, market research and data, product design, research and data, project and site information (existing or proposed), architectural and engineering plans, designs, renderings or profiles, letters, papers, documents, instruments, drawings or any other confidential information of any type or description. Recipient and its Representatives agree and acknowledge that the Confidential Information provided to it or its Representatives constitute unique and commercially valuable information which is proprietary to Insight. Accordingly, you shall not discuss any such information to or with third parties other than Insight or its duly authorized representatives.

2.    The Confidential Information will be used solely by Recipient or its Representatives for the purpose of evaluating the possibility of entering into a business relationship with Insight and shall not be used, directly or indirectly, for any other purpose or for its own benefit or for the benefit of any person or entity other than in association with Insight. Recipient and its Representatives agree to limit the dissemination of Confidential Information to only those parties who have a need to know the Confidential Information in order to assist the potential entry into a business relationship with Insight. It is specifically agreed that prior to any such disclosure of Confidential Information, the Representatives will be informed of the nature of the Confidential Information and you agree to provide a copy of this Confidentiality Agreement (prepared by us) to your Representatives.

3.   The term Confidential Information does not include any information which at the time of disclosure is generally available to and known by the public (other than as a result of its disclosure by you or your Representatives). This Agreement shall be inoperative as to particular portions of the information if such information: (a) was available to you on a non-confidential basis prior to its disclosure; or (b) becomes available to you on a non-confidential basis from a source other than Insight, its agents, representatives and employees under circumstances where such source is entitled to make such disclosure. However, no information shall be deemed to be known to the general public merely because portions or Components of that information are publicly available.

4.   If a business relationship is terminated by Recipient with Insight, or at any time terminated at the request of Insight, you will promptly return to Insight all copies of the Confidential Information in your possession, you will request your Representatives to return materials in their possession, and you will destroy all copies of any summaries, analyses, compilations, extracts, studies or other documents prepared by you for your internal use or for others which reflect the Confidential Information and you will direct your Representatives to do likewise.

5.   Recipient and its Representatives understand and acknowledge that Insight is making no representation or warranty, express or implied, as to the accuracy or completeness of the Confidential Information. Neither Insight or our representatives, nor any of our respective officers, directors, employees, agents, affiliates or controlling persons shall have any liability to Recipient, its Representatives or any other person resulting from your use of the Confidential Information. Nothing herein shall be deemed to prevent Insight from entering into any other agreement or arrangement with any other entity or person in connection with its Confidential Information.

6.   In the event you or anyone to whom you transmit Confidential Information pursuant to this Agreement becomes legally obligated to disclose any of the information, you will provide Insight with prompt notice before such information is disclosed so that it may seek a protective order or other appropriate remedy under a waiver of compliance. If required, you will furnish only that portion of the Confidential Information which you are advised by written opinion of counsel is legally required and will exercise your best efforts to obtain a protective order (at the expense of Insight) or other reliable assurances that confidential treatment will be afforded the Confidential Information being disclosed.

7.   Insight shall be entitled to all forms of legal and equitable relief if you breach, or threaten to breach, any of the provisions of this Agreement. You have carefully considered the nature and extent of the restrictions placed upon you and the rights and remedies conferred herein and acknowledge that the same are reasonable and are designed to prevent unlawful disclosure and unfair competitive harm to Insight and are fully required to protect the legitimate interests of Insight. In any litigation, the prevailing party shall be entitled to recover its litigation costs/expenses and reasonable attorney's fees.

8.   Recipient and its Representatives understand and agree that no failure or delay by

Insight in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise of any right, power or privilege hereunder.

9.    This Agreement is for the benefit of Recipient, its Representatives and Insight and shall be governed and construed in accordance with the laws of the State of Delaware.

10.   This Agreement shall remain in full force and effect until the earlier of either: (i) another written agreement with Insight or (ii) seven (7) years after termination of that certain Consulting Agreement dated September 30, 2016, executed between the parties. However, this Agreement of non-disclosure is perpetual with reference to any financial information obtained from Insight, and any of its owners, officers or directors, obtained during the term of the Consulting Agreement.

11.   The use of the words "you", "your", "its", or pronouns of similar import shall refer to Recipient and/or its Representatives unless the context dictates otherwise.

12.   If any provision in this Agreement is declared void or unenforceable, such provision shall be amended so that the same shall be enforceable to the fullest extent permitted by law, or, if totally invalid or unenforceable such provision shall be severed from the Agreement and the balance of the Agreement shall remain in full force and effect.

13.   This Agreement represents the entire understanding of the parties hereto and may be modified or waived only by a separate written instrument executed by Insight and Recipient expressly so modifying or waiving such Agreement.

By signing below, Insight and Recipient indicate their agreement with the terms set forth above.

Insight:

36 BUILDERS, Inc.

By: _____

Recipient:

Sequoia, L.L.C.
A Maryland limited liability company

By: _____
Name: _____
Title: _____

# EXHIBIT C

## CONSULTING AGREEMENT

**THIS CONSULTING AGREEMENT** (this "Agreement") is effective as of the 1st day of August 2018, by and between Insight Land Company, LLC, a Delaware limited liability company ("Insight"), and Sequoia, L.L.C., a Maryland limited liability company ("Consultant").

**WHEREAS,** Insight desires that the Consultant, through its member/manager, Jack H. Haese, provide certain consulting services ("Services") for the benefit of Insight and its affiliated entities, related to the pro-forma and development cost analysis, software integration and maintenance, and other assistance in the development of real estate related assets as determined by Insight based on consultation with Consultant, and Consultant has agreed to provide such Services pursuant to the terms and conditions of this Agreement.

**NOW, THEREFORE,** for and in consideration of the premises herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

1.      This agreement supersedes and replaces that certain Consulting Agreement dated October 12, 2016, which is terminated and of no further force and effect upon execution of this Agreement.

2.      Jack H. Haese, an individual, has resigned as Vice President and Director of Insight Homes, and all benefits afforded him in that position are terminated. As a condition of this Agreement, any accrued but unpaid vacation shall be paid as a part and portion of his final compensation as an officer.

3.      <u>Services</u>.  The Services shall include preparation of data base reports and formats for measurement of the performance of various developments and assisting Insight with analysis, underwriting, and implementation of a financial reporting strategy to be implemented during the development of the project or identified asset. When Insight obtains a contract to acquire an asset, Consultant shall work with Insight to develop, refine, and implement a reporting plan to measure the success of the investment strategy for the subject asset(s). Initially the focus of consultant shall be on real estate related assets including residential building lots and land entitled, or to be entitled, for residential development within the Delmarva peninsula; however, the parties hereto may modify the scope of services by mutual agreement at any time. To facilitate Consultant's performance of the Services, Insight shall provide Consultant, without charge, (only to the extent same

is not provided by another party) with assistance of any available support staff during the term of this Agreement.

4.    Consulting Fees - Rate.

a.    In consideration of the Consultant providing the Services to Insight in a manner reasonably satisfactory to Insight, Insight agrees to pay Consultant a consulting fee of ONE HUNDRED THIRTY-EIGHT THOUSAND AND NO/100 DOLLARS ($138,000) annually during the term hereof ("Consulting Fee"), commencing on the effective date hereof. The Consulting Fee shall be payable semi-monthly, on the 10th and the 25th of each month, at the rate of FIVE THOUSAND SEVEN HUNDRED FIFTY AND NO/100 DOLLARS ($5,750.00), by wire to an account designated by Consultant.   It is understood that the consultant may work on personal endeavors and that the Consultant will dedicate the time sufficient to perform the services hereunder, but shall remain subject to the confidentiality agreement, attached hereto as Exhibit "A" and incorporated herein by reference, executed between the parties. In additional, Insight shall provide Sequoia with a retainer in the amount of two (2) semi-monthly payments ($11,500) on the effective date of this Agreement, to secure timely payment of the semi-monthly fee (the Retainer"). Consultant is authorized to attach the Retainer in the event the semi-monthly payment is not timely made, and such retainer shall be replenished on or before the next scheduled payment due date.

b. Consultant hereby expressly acknowledges and confirms that it is an independent contractor hereunder and not a partner, co-venturer, co-owner or employee of or with Insight or any of its affiliates and, that as an independent contractor, Consultant is available to work for other business entities and individuals. Accordingly, Consultant expressly acknowledges and confirms that Consultant shall be solely responsible for the payment of all federal, state and local tax obligations including, but not limited to, income taxes, unemployment taxes, social security contributions, worker's compensation premiums, and all similar taxes and payments in connection with any fees or other compensation paid to Consultant under this Agreement, and for the filing of business or self-employment income tax returns, as applicable,  in connection therewith. Consultant expressly acknowledges that neither Consultant nor any employees or other individuals with whom Consultant directly or indirectly contracts with in connection with performing any Services required under this Agreement is an employee of Insight or any of its affiliates and, as such, shall not be eligible for any of the employee benefit programs of Insight or any of its affiliates.  Neither Consultant nor any employees or other individuals with whom Consultant contracts with in connection with providing any Services required under this Agreement shall have any claim against Insight or any of its affiliates for sick leave, health insurance coverage, retirement benefits, social security, worker's compensation, disability or unemployment benefits.  Consultant further acknowledges that Consultant shall (i) withhold, report and remit payroll taxes, (ii) pay unemployment

taxes and (iii) maintain workers' compensation insurance on behalf of all employees of Consultant used by Consultant in connection with this Agreement. Consultant has received, understands the consequences of and shall execute and deliver to Insight the Notice to Independent Contractors and Exempt Persons attached hereto as Exhibits A -1 and A-2 (the "Notices"); and Consultant shall satisfy all of its obligations under the Notices with respect to any employees or other individuals with whom Consultant contracts with in connection with providing any Services required under this Agreement, in accordance with Maryland law.

        c.  <u>Success Fees</u>- The Consultant is currently involved in the entitlement, engineering, negotiation, and finance of Anchor's Run (263 residential units) and Acadia (234 residential units). The completion of all entitlement work, agency and planning and zoning approval, recording of the plat, sale of the units as prescribed by Insight and or its affiliates, and the closing of associated financing are extremely important to Insight, and are the central tasks for the Consultant to complete. As additional consideration to be paid to the Consultant, in addition to the consulting fees outlined above, Insight shall pay to Consultant a "success fee" in the amount of SEVENTY FIVE THOUSAND AND NO/100 DOLLARS ($75,000) each, upon, a)  a completed closing and sale at record plat to a third party buyer with sale and development financing, as to the Acadia project, b), and to finance and start of construction, under terms of a sales contract as negotiated with a third party builder as to a portion or all of the lots, as to the Anchor's Run project.

      3.    <u>Agents and Commission</u>.  Insight and the Consultant each warrant to the other that neither has dealt with an agent, broker or finder with respect to the parties entering into this Consulting Agreement.  In the event any claim for commission or finder's fee is brought by any person or entity as a consequence of the foregoing representation not being accurate, then the party whose acts give rise to such claim shall indemnify and hold harmless the other party against any loss, cost or expense of any nature, including, but not limited to, court costs and reasonable attorneys' fees, arising as a consequence of the claim for a commission or fee.

      5.    <u>Representations and Warranties by Consultant</u>.  Consultant has the power and authority to enter into this Agreement and perform its obligations hereunder; the performance by Consultant of its obligations hereunder does not and will not violate any law; and neither this Agreement nor the performance by Consultant of its obligations hereunder violates any agreement or contract to which Consultant is bound or a party.  This Agreement is binding upon and enforceable against Consultant in accordance with its terms.

      6.    <u>Indemnification</u>.    As specifically provided for and limited hereby, Consultant shall protect, defend, hold harmless, and indemnify Insight and its

members, partners, affiliates, successors, heirs, assigns, directors, officers, employees and agents from and against all claims, actions, liabilities, damages, losses, costs and expenses (including court costs and attorneys' fees) arising out of or incidental to the performance by Consultant of any duties and obligations pursuant to this Agreement, or any breach by Consultant of the representations and warranties of Consultant under this Agreement; provided, however, that such indemnification shall be strictly limited to the actual damages suffered and shall in no event exceed the total fees paid Consultant in accordance with this Agreement. The foregoing indemnification shall survive the expiration or termination of this Agreement.

7.     Term.  The term of this Agreement ("Term") shall commence on August 1, 2018, and shall remain continually valid and enforceable, provided however; either party may terminate this Agreement with or without cause on sixty (60) days prior written notice to the other party hereto. It is understood and agreed that in the event this Agreement is terminated by either party the Consultant shall still be entitled to receive any unpaid portion of his Consulting Fee prorated through the date of termination. All matters related to the Confidentiality Agreement shall remain in full force and effect, even in the event of a termination of this Agreement.

8.     Notice.  All notices and other communications hereunder shall be in writing and be deemed duly given if personally delivered, telecopied with proof of receipt, or sent by nationally recognized overnight courier, or mailed by certified mail, return receipt requested, postage prepaid:

|                   |                                      |
|-------------------|--------------------------------------|
| If to Insight:    | Insight Land Company, LLC            |
|                   | 16255 Sussex Highway                 |
|                   | Bridgeville, DE 19933                |
|                   | Phone 302-337-0400                   |
|                   |                                      |
| If to Consultant: | Sequoia, L.L.C.                      |
|                   | 929 Mallard Circle                   |
|                   | Arnold, MD 21012                     |
|                   | Phone 301-370-6967                   |

The parties hereto shall be responsible for notifying each other of any change of address.

9.     Assignment.  Except for an assignment to an affiliate of Insight, the benefits hereunder are not assignable by either party without the written consent of the other party.

---

*Consulting Agreement*                                                      *Page 4*

10.    Construction of Agreement.

a.    This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

b.    Titles to paragraphs and subparagraphs are for convenience only and are not intended to limit or expand the covenants and obligations expressed thereunder.

c.    Time shall be of the essence with regard to all terms and conditions of this Agreement.

d.    This Agreement contains the entire agreement among the parties hereto with respect to the subject matter hereof.  No change or modification of this Agreement, or any waiver of the provisions hereof, shall be valid unless it is in writing and signed by the parties hereto.

e.    Waiver of performance or satisfaction of timely performance or the satisfaction of any condition, covenant, requirement, obligation or warranty by one party shall not be deemed a waiver of the performance or satisfaction of any other condition, covenant, requirement, obligation or warranty unless specifically consented to in writing.

f.    This Agreement shall be construed in accordance with the laws of the State of Delaware, without regard to its conflicts of laws principles.

g.    If any term, covenant or condition of this Agreement or the application thereof to any part shall be invalid or unenforceable, the remaining terms, covenants and conditions or circumstances shall not be affected thereby, and each term shall be valid and enforceable to the fullest extent permitted by law.

h.    All claims, counterclaims, disputes and other matters in question between the Consultant and Insight arising out of or relating to the obligations of the Consultant and Insight, as to each other, shall be decided by arbitration in accordance with the Arbitration Rules of the American Arbitration Association then obtaining, subject to the limitations and restrictions stated below. This Agreement so to arbitrate, and any other agreement or consent to arbitrate entered into in accordance herewith as provided in this paragraph, will be specifically enforceable under the laws of the State of Delaware.

i.    Notice of demand for arbitration must be filed in writing with the other parties to the Agreement. The demand must be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event may the demand for

arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations.

j.     All demands for arbitration and all answering statements thereto which include any monetary claim must contain a statement identifying the total sum or value in controversy as alleged by the party making such demand or answering statement and the arbitrators will not have jurisdiction, power or authority to render a monetary award in response thereto against any party which totals more than such stated amount (exclusive of interest and costs).

k.     The limitations and restrictions contained herein may be waived in whole or in part upon written consent of the Consultant and Insight, as to any claim, counterclaim, dispute or other matter specifically described in such consent. No consent to arbitration in respect of a specifically described claim, counterclaim, dispute or consent to arbitrate any other claim, counterclaim, dispute or other matter in question will constitute consent to arbitrate any other claim, counterclaim, dispute or other matter in question which is not specifically described in such consent or which is with any party not specifically described therein.

l.     The award rendered by the arbitrators shall be final; judgment may be entered upon it in any court having jurisdiction thereof, and will not be subject to modification or appeal except to the extent permitted by Section 10 and 11 of the Federal Arbitration Act (9 U.S.C. Sections 10 and 11).In the event of a dispute between the parties, each hereby agree and covenant to submit to binding arbitration.

WITNESS the following signatures and seals:

Sequoia, L.L.C.,                          Insight Land Company, LLC,
A Maryland limited liability company       a Delaware limited liability company

By: _____              By: _____
    J. Hutchins Haese, Manager                Robert M. Lisle, Manager

Exhibit A-1

Notice to Independent Contractors and Exempt Persons (in English)

Exhibit A-2

COMMISSIONER OF LABOR AND INDUSTRY'S NOTICE TO INDEPENDENT CONTRACTORS



**COMMISSIONER OF LABOR
AND INDUSTRY'S NOTICE
TO INDEPENDENT CONTRACTORS**

*FOR WORKPLACE FRAUD PURPOSES ONLY*



**If you have been hired an as independent contractor please be aware of the following:**

As an independent contractor you are expected to perform all work and all details connected with the performance of the work using your own means and methods, free from the control of the employer or work provider, except as to the final product or result.

As an independent contractor you will be responsible for all tax obligations including, but not limited to, the filing of business or self-employment income tax returns with the U.S. Internal Revenue Service.

As an independent contractor you are not eligible for protection under protective laws, including but not limited to, employment discrimination and anti-retaliation laws, occupational safety and health laws, living wage and prevailing wage laws, and wage and hour laws.

As an independent contractor if you hire employees to perform work, you will be responsible as an employer for all tax, unemployment insurance, and workers' compensation insurance obligations on behalf of those employees. You will be required to comply with employment law obligations, including safety and health and wage and hour requirements, on behalf of those employees.

As an independent contractor, if you contract with other independent contractors or exempt persons you will also be obligated to provide them with a Notice to Independent Contractors and Exempt Persons, which explains their status.

As an independent contractor or exempt person, you are required to provide to the employer or work provider copies of any licenses or registrations issued to you that are related to the work to be performed.

*Please note: This notice is intended to explain some of the consequences of working as an independent contractor. Just because you have received this notice does not mean that you are, in fact, an independent contractor. Whether an individual is actually an independent contractor or an employee is a legal determination made based upon specific facts and circumstances.*

If you have any questions, please contact the Commissioner of Labor and Industry at the address below.

---

**Department of Labor, Licensing and Regulation
Division of Labor and Industry
Worker Classification Protection**
1100 North Eutaw Street, Room 607
Baltimore, MD 21201
(410) 767- 9885 Fax: (410) 333-7303
E-mail: dldliwcpu_dllr@maryland.gov

Rev. 9/2015



**NOTICE TO INDEPENDENT
CONTRACTORS AND EXEMPT PERSONS**

*FOR WORKPLACE FRAUD PURPOSES ONLY*



**Employer/Work Provider Name:** Insight Homes, Inc.

**Independent Contractor Name:** J. Hutchins Haese, Sequoia, LLC

You have been hired as an independent contractor or exempt person to perform the following work for the employer. The Workplace Fraud Act defines an exempt person is an individual who operates with complete control of their own business that does not have any employees other than family members.

You have agreed to perform the work described in the attached section(s) of your contract, or as described below:

· All work and assignment as delineated under that certain Consulting Agreement dated to be effective August 1, 2018.

You have agreed to complete this work by:

As an independent contractor or exempt person, you will perform this work and all details connected with the performance of the work using your own means and methods, free from the control of the employer or work provider, except as to the final product or result.

As an independent contractor or exempt person you will be responsible for all tax obligations including, but not limited to, the filing of business or self-employment income tax returns with the U.S. Internal Revenue Service.

As an independent contractor or exempt person, you are not eligible for protection under protective laws, including but not limited to, employment discrimination and anti-retaliation laws, occupational safety and health laws, living wage and prevailing wage laws, and wage and hour laws.

As an independent contractor or exempt person, if you hire employees to perform work, you will be responsible as an employer for all tax, unemployment insurance, and workers' compensation insurance obligations on behalf of those employees. You will also be required to comply with employment law obligations, including safety and health and wage and hour requirements, on behalf of those employees.

As an independent contractor or exempt person, if you contract with other independent contractors or exempt persons, you will also be obligated to provide them with a Notice to Independent Contractors and Exempt Persons, which explains their status.

As an independent contractor or exempt person, you are required to provide to the employer or work provider copies of any licenses or registrations issued to you that are related to the work to be performed.

Signed:

Independent contractor/exempt person

Se pro. L. C.

H.t. ny Hese

Date

August 1, 2018

Employer/work provider

Insight Homes, Inc.

By

Robert M. Lisk, CEO

Date   August 1, 2018

*Please note that just because you have received this notice does not mean that you are, in fact, an independent contractor or exempt person. Whether an individual is actually an independent contractor or an employee is a legal determination made based upon specific facts and circumstances.*

If you have any questions, you may contact the Commissioner of Labor and Industry at the address below.

**Department of Labor, Licensing and Regulation**
**Division of Labor and Industry**
**Worker Classification Protection**
1100 North Eutaw Street, Room 607
Baltimore, MD  21201
(410) 767- 9885 Fax: (410) 333-7303
E-mail: dldliwcpu_dllr@maryland.gov

Rev. 9/2015

## CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT

This Confidentiality and Nondisclosure Agreement ("Agreement") is made and entered into effective as of this 1ˢᵗ day of August, 2018, by and between Insight Homes, Inc., having an address at 16255 Sussex Highway, Bridgeville, DE 19933 ("Insight") and Sequoia, LLC, having an address at 929 Mallard Circle, Arnold, MD 21012, (the "Recipient") for the purpose of memorializing the terms and conditions under which Insight has agreed to provide Recipient with certain confidential and proprietary information of Insight.

WHEREAS, a Consulting Agreement has been executed by and between the parties hereto, whereby confidential financial and corporately sensitive information (the "Confidential Information") shall be disclosed to Recipient and its Representatives during the performance of its duties during the term of the Consulting Agreement; and

WHEREAS, Insight is willing to disclose the Confidential Information to Recipient and its representatives at its discretion in consideration of, and as a condition to the following:

1.    Confidential Information is defined as follows: all information, whether written, electronic or oral, disclosed by Insight to Recipient or its Representatives, including without limitation, all corporate operating data and structure, know-how, trade secrets, and any other information related to the business of Insight including without limitation, business plans, financial and accounting information, pro formas and projections, market research and data, product design, research and data, project and site information (existing or proposed), architectural and engineering plans, designs, renderings or profiles, letters, papers, documents, instruments, drawings or any other confidential information of any type or description. Recipient and its Representatives agree and acknowledge that the Confidential Information provided to it or its Representatives constitute unique and commercially valuable information, which is proprietary to Insight. Accordingly, you shall not discuss any such information to or with third parties other than Insight or its duly authorized representatives.

2.    The Confidential Information will be used solely by Recipient or its Representatives for the purpose of enabling the Recipient to perform the Services for Insight required pursuant to the Consulting Agreement and shall not be used, directly or indirectly, for any other purpose or for its own benefit or for the benefit of any person or entity other than in association with Insight. Recipient and its Representatives agree to limit the dissemination of Confidential Information to only those parties who have a need to know the Confidential Information in order to enable the Recipient to perform the Services for Insight under the Consulting Agreement. It is specifically agreed that prior to any such disclosure of Confidential Information, the Representatives will be informed of the nature of the Confidential Information and you agree to provide a copy of this Confidentiality Agreement (prepared by us) to your Representatives.

3.    The term Confidential Information does not include any information, which at the time

of disclosure is generally available to and known by the public (other than as a result of its disclosure by you or your Representatives). This Agreement shall be inoperative as to particular portions of the information if such information: (a) was available to you on a non-confidential basis prior to its disclosure; or (b) becomes available to you on a non-confidential basis from a source other than Insight or its affiliates, or their respective agents, representatives and employees under circumstances where such source is entitled to make such disclosure. However, no information shall be deemed to be known to the general public merely because portions or Components of that information are publicly available.

4.    If a business relationship is terminated by Recipient with Insight, or at any time terminated at the request of Insight, you will promptly return to Insight all copies of the Confidential Information in your possession, you will request your Representatives to return materials in their possession, and you will destroy all electronic and hard copies of any summaries, analyses, compilations, extracts, studies or other documents prepared by you for your internal use or for others which reflect the Confidential Information and you will direct your Representatives to do likewise.

5.    Recipient and its Representatives understand and acknowledge that Insight is making no representation or warranty, express or implied, as to the accuracy or completeness of the Confidential Information. Neither Insight or our representatives, nor any of our respective members, officers, directors, employees, agents, affiliates or controlling persons shall have any liability to Recipient, its Representatives or any other person resulting from your use of the Confidential Information. Nothing herein shall be deemed to prevent Insight from entering into any other agreement or arrangement with any other entity or person in connection with its Confidential Information.

6.    In the event you or anyone to whom you transmit Confidential Information pursuant to this Agreement becomes legally obligated to disclose any of the information, you will provide Insight with prompt notice before such information is disclosed so that it may seek a protective order or other appropriate remedy under a waiver of compliance. If required, you will furnish only that portion of the Confidential Information which you are advised by written opinion of counsel is legally required and will exercise your best efforts to obtain a protective order (at the expense of Insight) or other reliable assurances that confidential treatment will be afforded the Confidential Information being disclosed.

7.    Insight shall be entitled to all forms of legal and equitable relief if you breach, or threaten to breach, any of the provisions of this Agreement. You have carefully considered the nature and extent of the restrictions placed upon you and the rights and remedies conferred herein and acknowledge that the same are reasonable and are designed to prevent unlawful disclosure and unfair competitive harm to Insight and are fully required to protect the legitimate interests of Insight. In any litigation, the prevailing party shall be entitled to recover its litigation costs/expenses and reasonable attorney's fees.

8.    Recipient and its Representatives understand and agree that no failure or delay by Insight in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise

---

of any right, power or privilege hereunder.

9.   This Agreement is for the benefit of Recipient, its Representatives and Insight and shall be governed and construed in accordance with the laws of the State of Maryland.

10.   This Agreement shall remain in full force and effect until the earlier of either: (i) another written agreement with Insight or (ii) three (3) years from the date of execution of the Consulting Agreement. However, this Agreement of non-disclosure is perpetual with reference to any financial information obtained from Insight or any of its affiliates, and any of their respective owners, officers or directors, obtained during the term of the Consulting Agreement.

11.   The use of the words "you", "your", "its", or pronouns of similar import shall refer to Recipient and/or its Representatives unless the context dictates otherwise.

12.   If any provision in this Agreement is declared void or unenforceable, such provision shall be amended so that the same shall be enforceable to the fullest extent permitted by law, or, if totally invalid or unenforceable such provision shall be severed from the Agreement and the balance of the Agreement shall remain in full force and effect.

13.   This Agreement represents the entire understanding of the parties hereto and may be modified or waived only by a separate written instrument executed by Insight and Recipient expressly so modifying or waiving such Agreement.

By signing below, Insight and Recipient indicate their agreement with the terms set forth above.

Insight Homes, Inc.,
A Delaware corporation

By: _____
        Robert M. Lisle
        Chief Executive Officer

Recipient:

Sequoia, L.L.C.
A Maryland limited liability company

By: _____
        J. Hutchins Haese
        Managing Member